Good morning. May it please the court, I'm Robert Goldman, counsel for the appellant and with me is Eric Reed. I would respectfully ask to reserve three minutes rebuttal time. I think we have three interesting issues here today. I'd like to get started in the order that I think are the easiest to deal with and the quickest and then save the treaty power argument to the last because of the time. Why don't you not even get to the last ones and go straight to the treaty power for fear that we don't get to that. Yes, it was Thomas Jefferson that stated that if treaty making power is boundless then we have no constitution. And in addition to what Thomas Jefferson said, Alexander Hamilton who was one of the premier promoters of a strong federal government said on natural principles a treaty which should manifestly betray or sacrifice primary interest of the state would be null. Your opponent would say you have a great argument up until 1920. How do you deal with Missouri v. Holland? With covert v. Reed, Reed v. Covert which is 1957. Okay, why don't we go through. In 1920 you have Missouri v. Holland, the 1918 Migratory Bird Act. That's correct, Your Honor. And how would you distinguish Justice Holmes, that was a nine to zip opinion, right? I believe so, Your Honor. That was, commentators described his words concerning the treaty making power as being dictated in that case. If you look at the facts of that case, I think anyone looking at that case would have no problem saying the federal government would be involved in that. As the court stated, migratory birds are only for a moment present in a state. They're only transitorily within the state and has no permanent habitat therein. But for the treaty and the statute there soon might be no birds. That's correct. Well, isn't that, can't you make the same sort of argument about dangerous contraband that it moves around, crosses state lines, in fact crosses international lines which is why it's the subject of a treaty? Your Honor, I don't think it's the same. I think it can. Well, I know it's not the same. But it's not a migratory bird. On their own. Yes. So I'm clear that it's not the same. But to Judge Ambrose's point which is Justice Holmes spoke very specifically about this is something that is of a national interest and an international interest. Distinguish, why is the control of dangerous chemicals not something that goes beyond a local jurisdiction's interest? I think where Congress made the mistake in this case they could have dealt with a very important issue being the spread of chemical weapons and done so by using language which would have put in a simple clause that had an effect on interstate commerce. If you look at the, if you drop an atomic bomb in the United States, you're guilty of a criminal offense only if you show that there's an effect on interstate commerce. We put in our appendix every federal statute that deals with any type of assaultive behavior must have either a jurisdictional connection of an assault on a federal official or there be an effect on interstate commerce. Well, how about if they had said now one of the, in the legislative history, the comment on the definitions talks about chemical weapons and says as long as the types and quantities are consistent with such purposes. What if Congress had said chemicals in substantial quantities such that they could be of a threat on an international basis? Would that have sufficed? I think that would have sufficed because obviously this convention was intended to deal with the rogue state to deal with the terrorists. It wasn't intended to deal with the housewife who was striking at a rival. In this case, I think what's very important and I think as time progresses, we're so far past 1920. As time progresses, we're now at a point where some people could question and perhaps fear the federal government getting too powerful. Let's just take a look at the language that Justice Holmes used in Missouri-Dallas. He said, it is obvious that there may be matters of the sharpest efficacy for the national well-being that an act of Congress could not deal with but that a treaty followed by such an act could. If you follow that logic, we can tend that to be dictative. If you follow that dictative to its logical conclusion, then there is no bounds. I'd like to see what the government says on this. There is no criminal statute that is today primarily the sole province of a state that could not then be taken over by the federal government. What we're dealing with today as time has changed and we're now cognizant of perhaps some potential concerns with perhaps the federal government at times is that what we do today could have an effect for generations. There's been no case that I've seen that deals with a set of facts which is so atypical of a case that should be… You started off at the outset. You said, okay, Reed v. Covert in 57 and then also if you touch on that and then the Lara case from 2004 when it looks like the Supreme Court in Justice Breyer's opinion is saying Missouri v. Holland is good law. Judge, in Reed v. Covert at page – I don't have the page – there's nothing in state of Missouri v. Holland which is contrary to the position taken here. And what that position is, I believe it's at 1231. That position is the Reed – Which some may argue what you're doing is just limiting Reed to its facts because they were trying to deal with the exigent circumstance of how to deal with a hue and cry in Congress to overrule Missouri v. Holland. If you look at Missouri v. Holland, it's a three-page opinion. If you look at Reed v. Covert, they're dealing with a much more significant violation – Almost all of Holmes' opinions were very short. Yeah, I don't think it gets this traction. That's not going to take you real far. He didn't write a lot so it doesn't persuade. But, Your Honor, what I'm saying is in Holland, you're dealing with a smaller issue, dealing with migratory birds. In Reed v. Covert, you're dealing with constitutional issues. You were dealing with constitutional issues in Holland. It's in fact the very same constitutional issue, isn't it? That you – in Article I, that the powers of Congress, the Necessary and Proper Clause, are limited to those things that came before. And what you have is a treaty provision that's provided in Article II. And yes, Congress can approve or ratify a treaty, but then the question is, can you then do another law based on the power that purportedly the treaty gives you? In other words, it's a bootstrap argument. To me, they had the power to pass the treaty, but then it was incumbent upon Congress to take certain actions and to render certain precautions in the enactment of the domestic legislation. Judge Jordan's point is, wasn't that the issue before Missouri v. Holland? I think the distinction, Your Honor, in Holland is that in that case, by its very nature, it dealt with matters which were not just of a state concern, but were of a national concern. The problem here, the statute – I mean, the statute tracks the treaty. And you would think if Congress is going to do anything, it should be able to track a treaty. The treaty specifically says that you shall have penal provisions against individuals. So in order to comply, it needs to do that. Is it the problem with the statute, or is it the problem with the application? And we need to make sure that it's applied in a constitutional manner. And let me offer a hypothetical. What if under the migratory bird law, an individual had a bird that happened to be migratory in their home, and by feeding it the wrong food, it killed the bird? And it got prosecuted because it had killed a migratory bird. That, to me, parallels the situation here. Is it that the statute violates the Constitution in its breadth and in its lack of jurisdictional nexus? Or is the lack of reasonable relationship between the prosecution and the law itself, as we interpret it? I believe we argued both, Your Honor, in this case. What's your best case for either proposition, and which do you urge? I urge very quickly that I think with changing times, we need to take a look again at Reed and take a look at Holland, where you have a situation. If Holland means what some people say it means, then it has a devastating impact on the relationship between the states and the federal government. Reed says that there are constitutional restrictions to the statutes which are passed pursuant to a treaty. And I think that these days the courts need to give more attention to the warnings in Reed,  and the application factor, how broad this is. If date rape cases would now be federal offenses, feeding antifreeze to a cat would be a federal offense. Don't you have to, in your instance, since this is not a First Amendment case, aren't you, aren't we, I guess is a better way to put it, aren't we limited to examining the breadth of the statute within the limits of this particular case? Not hypotheticals, but looking at the application in this case. That's how I understand our responsibility under the United States v. Woods. Am I mistaken about that? I believe it's broader, though, Your Honor, because of what this court, the opinion that the court renders in this case can make the difference on whether or not statutes such as this, or treaties and statutes passed pursuant to treaties continue down this slippery slope. Then let's look at this case and not the date rape or Clorox for your cat question, but this specific case. Do you think it's fair to say that people would not understand that you can't take a highly corrosive toxic chemical and repeatedly put it on surfaces that you know someone's going to be touching because that would cause chemical poisoning? Especially when you know that touching it, this is actually going to be worse than ingesting it. I believe that such a person would know that they're committing violations of state law but not federal law. The federal law is so broad. What is a toxic weapon, I'm sorry, what is a chemical weapon in the statute? It's not even a weapon. The definition of a chemical weapon is a toxic chemical used for other than peaceful purposes. So it's not even a weapon. But if the statute says that, yo, it's this broad, then it is that broad. I mean, it would be one thing if the statute left it, you know, gee, I can't figure out whether this is a chemical weapon. The statute puts you on notice. Stuff is a chemical weapon. There's no doubt about that. Now, it's very broad, but that doesn't mean it's vague. It's not vague at all. It's just very broad. Let's keep the two things in sync because I think you seem to be, or at least to me, Mr. Goldman, you seem to be swinging between your two arguments. I understand your argument that, gee, it's just not right for this to be federal as opposed to state, but let's leave that aside for a second. Just looking at is it so vague that people wouldn't understand it. Can you really take the position that people wouldn't know that if there's a federal law that says what this says that you can't, that I couldn't understand that that means I can't take a highly toxic chemical and try to poison my neighbor with it? Your Honor, I believe that a statute can be so broad as to be meaningless. That's my position. And that in this case, it doesn't even need to be a weapon. It's so broad. And there has to be some sort of scrutiny on these statutes in order to give protection to the citizenry. Not really. I mean, a statute could say, could be very, very broad. The only limits on breadth are constitutional or vagueness. And it's not vague if it's so broad. But it's broad. It can't be meaningless. If it's so broad, it has to be meaningful and encompass the wide range. Your Honor, you'll note that our primary argument was against the enactment of the statute as opposed to the application. I think that's our stronger argument. Am I deal with the special skills? Because, frankly, that's one that I expected the government to concede. In this sentencing guidelines, it provides for – You're talking about chemists, those who have skills that aren't necessarily in the ordinary public. She was very well trained. Judge, in this case, the government in the beginning of the proffer said that we will show that she had a special skill as a chemist and that she used it to pick the chemicals. She had that unique skill. We then dismantled what the government said. She was not a chemist. She was a microbiologist. What is a microbiologist? Totally devoid in the record any explanation on what a microbiologist is. But there was a record that she had worked for Roman Haas for many years and had some training with chemicals. And, in fact, the record shows that if you draw some inferences, which I think we can believe the district court did, the district court looked and saw she picked a chemical which was uniquely toxic to the touch. That's the sort of thing that the general public wouldn't know. Judge, that's a red herring by the government. They proved that these two chemicals were dangerous, but Roman Haas had 20,000 other chemicals. They didn't, on the record, distinguish these chemicals from perhaps 10,000 others or 5,000 others. But she wasn't shooting in the dark of these 20,000 as to which one she picked, was she? I mean, she could have had talcum powder and something else, but these were clearly toxic. If you look at the record, you will see that even a lawyer, in two minutes, that being me, went to Google, went to the MSDS list, which is available on Google. You can look up any chemical, and you can see whether or not you need to wear gloves, which is what the judge said she knew to wear gloves, and also the toxic nature of those chemicals. Doesn't that prove the point, though, Mr. Goldman? Because you're looking up what she found. The point is she found, she didn't go, I don't know. She knew it. It's not like I'm going to look and see what you did with the chemical. She came up with the chemical idea. This is the chemical I'm going to use. It turns out to be, as the government argues, a remarkably well-calibrated weapon for the purpose she wanted to use it for. Why can't the district court make an inference on that? What the government didn't do, Your Honor, is there's 20,000 chemicals at Roman Haas, and they didn't explain, on the record, that there's a difference in 20,000 other chemicals. I mean, you could have gone, the one chemical that they're talking about, you can go on Amazon.com and for $12.97 get a pound of it. But I wouldn't know to do that. But you could. I wouldn't know that that would do the trick. But if your law clerks were to go to Google MSDS and start going. I wouldn't even know there's an MSDS. But I think that's missing. Maybe there is. Judge, if I could. I think we're missing, we're talking past the point. If I could. The point isn't that you could go see what she did. It's that she came up with it on her own. If you go to the cases, which we cited in our brief, and I think there's some parallel cases, and you look at MBNA case, it's not the name of the case, but in that case the government was saying that those people got the specific training at MBNA, I'm sorry, whatever it was, in order to commit the offense. And the court says, that's not special skill. That's skill that's held by all the people at that location. In this case we showed that all 1,000 employees at Roman Haas have the same training on how to look at an MSDS, availability of the chemicals. Is that the law? Or is the law not what other people at a chemical company could do, but what other people in the general public would know? In some cases they look specifically at, there's two cases, dealing with ATM machine in one case and MBNA. And in those cases they looked at those people. In other cases they looked at general public, and my position is that as a member of the general public, you could find this out about these chemicals. And there is no, if you look at a microbiologist, what's the special training there? What do they do? Never put on the record. The government grasped that. Once they failed and we proved that she wasn't a chemist, which they were hanging their hat on, what's a microbiologist? The record is devoid of any mention of what that person is. Microbiologist deals with living organisms, fungus, mold, and biological agents. No connection between that special skill and this case. I mean, to me, you know, that enhancement of two levels was totally inappropriate in this case, was clear error. All right, we'll hear from you. Thank you. Thank you. Good morning. My name is Paul Shapiro. I'm an assistant United States attorney. May it please the court, I represent the United States. Just at the outset on the issue pertaining to the constitutional issue, why was it that 229 didn't have a federal nexus here, such as across state lines? She ordered the, I think it was the potassium dichromate across state lines. That turns out to be the case, and the other chemical was manufactured in Massachusetts. Why didn't the statute just deal with it that way instead of go the hard way? Well, I would actually characterize it as the opposite, Your Honor. I think they went the easy way, which is what the court is asking is could they have tied it to interstate commerce, and the answer is clearly yes. But that's not in the statute. Well, it doesn't need to be in the statute, for one thing. The defense keeps arguing that there needs to be a jurisdictional nexus in order to qualify it under interstate commerce, and they point to statutes where that's done. But there are many statutes where it's not done. For example, the Supreme Court just recently upheld the drug statutes, which have no interstate commerce nexus. But the Supreme Court had no problem finding that they were valid under the Interstate Commerce Authority because drugs travel in interstate commerce. But your question, Judge Ambrose, was why wasn't it done, and my answer would be because Congress wanted to go the easy way, not the hard way, which is in this case there was a treaty. Congress has power under the Necessary and Proper Clause to enact statutes pursuant to valid treaties. But the statutes don't pass muster constitutionally just because there is a treaty. Congress has the power in Clause 18 of Article I, Section 8 to do laws or enact laws pursuant to the preceding 17 items, right? Actually, Necessary and Proper says pursuant to anything going before and anything else in the Constitution. Well, to make all laws which shall be necessary and proper for carrying into execution the foregoing powers and all other powers vested by this Constitution in the government of the United States. So are you saying in the government of the United States allows you to bring in Article II? Absolutely, and not only am I saying it, but as the Court pointed out, that's exactly what Justice Holmes— Well, Holmes didn't quite say it that way, only. He said it—I think he said it better, but that— I'm not going to argue with Justice Holmes. But if we had not had transitory birds in Missouri v. Holland, I mean, he said the subject matter is only transitorily within the state and has no permanent habitat therein. He's saying this is not something that is a state concern. It is a national concern. Contrast this with the definition in the statute of chemical weapon which applies to any chemical that is sitting anywhere in these United States and is, in fact, stationary and is in the most minute quantity that certainly was never anticipated under the treaty. And I think that—I'm glad to make that contrast, and that contrast favors this statute. How so? If you look at what does the Migratory Bird Act prevent, and we go back to 100 years ago, what the Migratory Bird Act prevented was some farmer in some log cabin from walking out of his back door with a gun, aiming it overhead, and shooting at a Canada goose. There is—it is hard to imagine something that is of more local concern than that. And, indeed, it is hard to imagine a statute that covered something that was traditionally more of local concern than when and under what means game could be hunted. And, indeed, two courts had struck the statute down prior to the treaty as being violative of the Tenth Amendment exactly because it was local. But the birds here are kind of like the—I forget the case in the Interstate Commerce Clause for the grain—but the birds do add up to the hunger threat. Query whether chemicals sitting on a doorknob add up to the weapons of mass destruction threat here. It's a matter of type and degree as to what the national interest is. The national interest in hunger is implicated by every bird. You can't draw a distinction. Whereas weapons of mass destruction and what they're telling the states to do in terms of the development of chemical weapons is diametrically different from a small—something in a Petri dish or on a handle or in a muffler of a car, is it not? No, Your Honor. As I was saying before, the comparison favors this statute, and here's why. Number one, the statute here is not a weapons of mass destruction statute. That's how the defense characterizes it. But I think if you read it as carefully as you can, you will never find weapons of mass destruction. What you will find is there were several concerns that animated the treaty. Concern number one is dealing with terrorism and terrorist incidents. But they also were highly concerned about national and international commerce in chemicals, and they wanted to make sure that prohibited uses were banned so that peaceful uses and other permitted uses were facilitated so that countries didn't feel required to clamp down on chemicals  What's the limits? Is there a point at which we look to a statute and see if it does impose or impede states' rights? There are really two questions tied up with that, and they're questions that the defense confounds. So the analysis really takes two levels. Level one is for any statute under any authority, whether it's bankruptcy or patent authority, does Congress have a basis on which to pass this statute? And that's the question that we have been dealing with. And what's the basis here? And the basis here is the treaty authority. So what would happen here if the president rescinded the chemical weapons convention? Would 229 still be there? I guess we would have to deal with whether it was valid under the Commerce Clause or some other clause. Is that an avenue that you're suggesting we could take anyway? I mean, you said that the Supreme Court recently upheld drug laws on the basis that they implicate interstate commerce, even though the statutes themselves don't speak in terms of interstate commerce. Is the easy route to constitutionality here to say, well, we don't have to decide whether this would be constitutional on the broadest scale possible? It's enough to note that here the chemicals traveled in interstate commerce and under the Supreme Court authority on the drug laws. This is all right. Or is that not a sensible approach to take? I think the Court could do that. I think that it is sustainable on that. But I think that's the hard route, as Judge Ambrose would characterize or his question led me to characterize it, which is here you have a statute that tracks almost word for word the treaty. You have law dating back 100 years recently reaffirmed that where you have a valid treaty, a statute that carries that treaty into effect is necessary and proper. Well, doesn't Holland actually say more than that? Doesn't Holland actually say that there has to be a national and an international interest coupled with the treaty? No. Holland doesn't say there has to be. Well, those are the terms that Justice Holmes was using, wasn't it? In Holland, he said that there was here a national interest of virtually the first order. And he was responding directly to the assertion that this shouldn't be allowed because it allows the Tenth Amendment, it allows the treaty power to swallow up the Tenth Amendment. I mean, he was, unless I misread his opinion, the assertion of a national, international interest was a response to the kind of argument that Mr. Goldman is making here. So my question to you is do we need to take that as part and parcel of binding authority on us that it's not enough to say, hey, it's a treaty. It's got to be a treaty with an identifiable international and national interest. And this treaty, I guess the answer is the court doesn't have to reach what would happen if you had a treaty that didn't have one. This one clearly does. Because when we talk about national interest, you don't analyze and say does every case that falls within the treaty or falls within the implementing statute necessarily have a national interest. Because in the case of migratory birds, the farmer shooting a single bird or interfering with a single sparrow, assuming sparrows are migratory, clearly does not invoke a national interest. But the point is, as a whole, the subject matter does. The same with state inheritance laws, which were proper grounds for a treaty in the Geoffroy case that the defense cites. That was a very, very early case, I want to say 1870, where there was a treaty that obligated the United States and France to pass laws providing for the inheritance of property within states as the other country had. And it's hard to imagine an area of greater traditional state concern than inheritance. And the Supreme Court had no problem saying that that was an issue of national concern. But here, when they say here a national interest of very nearly the first magnitude is involved, it can be protected only by national action in concert with that of another power. And the same is true, I guess, certainly the same is true of chemical weapons and of the use of chemicals and facilitating the availability and travel of chemicals across national borders and within nations. But second – You don't have to make an argument that broadly, though, do you, Mr. Shapiro? Because if that's your argument, I mean, heavens, at its base level, right, everything's made up of chemicals. If you said any movement of chemicals across state line, that's international, then there'd be nothing that the federal government can get its hands around. I mean, it can't be your proposition – This statute doesn't do that. Right. It can't be your proposition that the federal government, by virtue of this treaty, now has control over everything because everything's got chemicals or chemical precursors. No, but my point is that there is a – the point that I was making, and maybe too broadly, but the point that I was making is when you talk about a national interest, there clearly is a national interest in the regulation of dangerous chemicals. And that's enough for this case because? Because once the statute itself is valid, once there is authority for Congress to pass it, there are then the next test, and this is what I was getting to before. Just because the statute is authorized under any power, whether it's treaty power or bankruptcy or patent power or commerce power, that isn't the end. That's the beginning. Does Congress have the authority to pass it? Once you get over that hurdle, which we do here by virtue of the treaty, the next question is does it conflict with an affirmative prescription in the Constitution so that you couldn't, even if there were a treaty that permitted warrantless search and seizure, it might be validly passed pursuant to the treaty. In other words, Congress has the power to pass that statute. But having once passed it, that statute is unconstitutional because it conflicts with the Constitution. And that's exactly what the Supreme Court was saying in Reed v. Covert, which is just because you have a treaty and just because you have a statute pursuant to a treaty, that doesn't make it constitutional. It can still be unconstitutional in the same way a statute is unconstitutional. It conflicts with the Constitution, which is the supreme authority. But you're saying as long as there is no affirmative prohibition, the treaty and the law that matches the treaty can do anything at all as long as there is no stated prescription? I don't know that I would say anything at all. The cases suggest that there is probably some outer limit. For example, you couldn't upend the relationship between the federal government and the states. Okay. How about that? But what you put... Isn't that what's happening here? Absolutely not. What's happening here is what typically happens when Congress occupies a field or moves into a field, like, for example, the drug field. The regulation of possession of narcotics is something that was the traditional state domain or the regulation of felons possessing weapons was a traditional state domain or Hobbs Act cases are traditional state domain. It's a robbery. Prior to this particular 229 becoming law, how would you have prosecuted this case under federal statute or would you have referred it to the state? I don't know the answer to that question. In this case, it's clear how the case came to the federal authorities. But if it wasn't for this particular statute, is there anything else you could prosecute under federal law? Well, certainly the theft of mail does not present a problem. That's not going to get you 72 months. But that's not... probably not. I think. Although to the extent that the same conduct is relevant conduct under the guidelines, the court has the authority under Booker to impose whatever sentence it deems appropriate. But I understand the court's question, and the short answer is, I don't know if there were some other federal route to prosecute this crime. In terms of endangering the postal workers who were placing mail in the mailbox, there's a possible route there. I don't know whether there's some other statute that would comprehend it. Do you know if there was any thought to having this case prosecuted under state law initially? I don't know whether there was thought to it or not, but it certainly falls within the scope of a valid and extant federal law. Well, since the police told the victim, just wash your car, it didn't look like there was a whole lot of state interest, did it? That's quite true. Or state training. And that behavior on the part of the local authorities was consistent. You had a victim here who was attacked 27 times, and the police came out one time and tested to see if it was cocaine that was being left on her car for some inexplicable reason. And she did not get any attention from anyone until the postal inspectors were brought into it, really sort of incidentally, because the police referred her to the post office. And that was what I was suggesting before, which is we know how it got to my office. Whether it could be prosecuted in some other way. That may be another thing the police did right here. Maybe. But there are lots of cases and lots of subjects. You could be asking me the same question. We have a Hobbs Act robbery of a beauty supply store in West Philadelphia. That's something that could be prosecuted under state law. It's a robbery. But it's not. We prosecute them as Hobbs Act. And indeed, the circuit courts are uniform that you may prosecute the robbery of a drug dealer on a street corner as a Hobbs Act robbery because it's an interference with commerce. So the fact that something can be prosecuted by the state, and indeed is analogous to something that is a common state law crime, in no way interferes with your ability to prosecute it federally as long as there is a valid and existing statute. And my answer is there is a world of distinction between the affirmative prescriptions of the Constitution, like thou shalt not establish a church, and the negative prescription of the Tenth Amendment. Because the Tenth Amendment is like a residuary clause in a will, which is you have a body of stuff, and it goes to the designated residual beneficiary unless something is taken away. Isn't that, in a sense, an affirmative prohibition by taking it away if it's not included? No, Your Honor, because as the cases point out, one of the powers that the Constitution gives to Congress is the power to pass statutes pursuant to a treaty. And in the same way that the Supreme Court has made absolutely clear that the spending clause allows Congress, allows the federal government, to regulate areas that it otherwise could not, so too does the treaty power. So there are many, many things, including this, that the federal government can do that maybe it otherwise could not. But the fact that it can do something that it otherwise could not isn't a reason that it can't do it. All right. Thank you. Rebuttal? Judge Anabro, to answer your question... Wait one second. Sorry. We'll put on the rebuttal time. Judge Anabro, to answer your question, pre-indictment we submitted a memorandum to the United States Attorney's Office with our argument. We said, from your point of view, bad cases make bad law. We offered to plead guilty in state court. We were indicted nonetheless. One argument, I mean, if you take a look at Article I, Section 8, Clause 18, it does talk about to make all laws, Congress shall have the ability to make all laws, shall be necessary and proper for carrying into execution the foregoing powers, that's the first 17 powers. And then it goes on, and all other powers vested by this Constitution in the government of the United States or any department or officer thereof. And then when you look at the treaty power, which is in Article II, it says in he, the executive, shall have power, capital P as it has in Article I, fine with the advice of the consent of the Senate to make treaties. So if you don't, in the first phrase of Article I, Section 8, Clause 18, may not get you home, why doesn't the second phrase get you there? I agree. Make it easy, I agree with you. That there's a law review article, Harvard Law Review Article 87. Rosencrantz? Yes. Yeah, I've read it. Right, and he does a much better job than I do. I'm not a constitutional scholar when it comes to arguing these points. But, you know, I agree with his position that for those who take comfort in Holland, you know, that should be reconsidered. And that's what we're asking this court to do. Could I answer a question from Judge Jordan? Judge Jordan, I found that MBNA case. And in that case, they said she was one of 700 to 800 persons employed by MBNA in the same position, all of whom were provided the same entry-level training. And in our case, the expert who was called from Roman Haas said that she got the same training that 1,000 employees got at Roman Haas. And if you look at the judge's specific findings, he doesn't find that she specifically, this is answering Judge Rendell's question, Judge Giles does not find that she used her expertise as a microbiologist to pick these particular chemicals. He talks about how… He talks about using gloves. Using gloves. My wife counsels me on using gloves every time I use a chemical or use a power tool. This old house counsels you on that every day. Home and Gardens on cable TV counsels you on that every day. Does the sentencing guide, regardless of what the MBNA case says, the language of the sentencing guidelines directs attention to the general public as when looking at specialized skill, doesn't it? It does. And Harper, which is another case, and Harper is a… ATM expertise, being a technician, it was common. And in the District of Columbia Circuit, United States v. Young, rejected an argument that all people who manufacture PCP are subject to special skill adjustment simply because most people in the general public do not possess the skill. So there's cases here that are saying that when there's common knowledge within a particular area, one of the cases says that if you apply this too broadly, the statute then is meaningless, and that's what we're submitting to is meaningless. And their expert themselves said that it does not require a special skill or to be a chemist to understand the dangerous nature and toxicity of the chemicals used. So in this case, if you look at the record, their own expert that's called by Roman Haas says that she didn't have a special skill that was specifically used to significantly facilitate the commission of the offense. It's simply not proven in this record. And finally, we contend that Judge Giles used mere conclusions in making this finding. And in United States v. Gandhi, they state, mere conclusion would not support a finding without specific explanation of how the defendant used the skill. And the sole specific explanation is using the gloves. And that's not a special skill obtained from a microbiologist. And again, no tie-in, no explanation of what's the talent of a microbiologist. They gave her that label, and they got the judge to bite on it with no explanation, not one sentence to explain what a microbiologist does that gives her a special skill in this case. Thank you. Thank you. The case is well argued. We'll take it under advisement.